**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____x

BDO USA, P.C.,

                                                Plaintiff,

        -against-                                               No. 24 Civ. 101 (CM)

JUSTIN ROJAS,

                                                Defendant.
_____x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 6/27/24

## MEMORANDUM DECISION GRANTING DEFENDANT'S MOTION TO TRANSFER

McMahon, J.:

This case arises out of Defendant Justin Rojas's departure from his employment with Plaintiff BDO USA, P.C., ("BDO") to nonparty Armanino LLP ("Armanino")— a BDO competitor. BDO alleges that Rojas – upon departure from BDO and in violation of his employment agreement– stole BDO clients (Clients A, B, and C) and employees (Timothy Vacchi, Kaylin Koopmans, and Tara Dunphy) and brought them to Armanino.

On January 5, 2024, BDO filed its Complaint, (Dkt. No. 1) ("Compl."), alleging claims against Rojas under New York law for breach of contract, breach of the duty of loyalty, and as a faithless servant.

Rojas now moves to dismiss the case in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, moves to transfer the action to the District of Colorado pursuant to 28 U.S.C. § 1404(a). (Dkt. No. 14.)

For the reasons that follow, Defendant's motion to transfer is GRANTED. Accordingly, the court does not reach the merits of Defendant's motion to dismiss.

**BACKGROUND**

The below is simply a summary of the allegations in the Complaint. These are not facts found by this Court.

## I.   Rojas's Employment at BDO

Plaintiff BDO is a corporation incorporated under the laws of Virginia with its principal place of business in Chicago, Illinois. (Compl., ¶18). BDO provides accounting, auditing, tax, and consulting services to clients across the country, and has offices in over thirty states, including in Denver, Colorado. (*Id.* ¶23). It can fairly be described as a nationwide employer.

Defendant Rojas is an individual domiciled in the state of Colorado. (*Id.* ¶19). From approximately October 27, 2021, to November 3, 2023, Rojas was a Tax Managing Director at BDO's Denver, Colorado office, where he provided tax advising services to BDO's Colorado clients. (*Id.* ¶38).

Upon commencement of his employment at BDO, Rojas was required to enter into an employment agreement (the "Agreement"). (*Id.* ¶26). The Agreement contains the following covenant regarding the solicitation of BDO clients:

> If, without the specific written consent of the Chief Executive Officer, or his/her designee, Employee performs by himself/herself, or through an entity with which he/she is or becomes associated, or arranges for such entity to perform, engagements involving accounting, auditing, tax, investment advisory or consulting services, or any related services, for a Client (defined below) or causes a Client or Prospective Client (defined below) of [BDO] to terminate its relationship with [BDO] through unfair competition or business practices, including through the unauthorized use of Confidential Information, then Employee will compensate [BDO] for the loss and damages suffered by [BDO] by reason of lost engagement(s)....
> [A] "Client" is a client with whom Employee has a relationship which [BDO] enabled him/her to acquire, develop and/or otherwise maintain while employed by [BDO] through his/her performance of services for such client or other activity, or as to whom Employee has Confidential Information obtained through [BDO], and a "Prospective Client" is any person, company, partnership or other entity to which [BDO] has made an oral or written proposal to perform services and for which

Employee was involved in such proposal or had access to Confidential Information regarding such proposal.

(Compl., Ex. 1 ¶ 7(a)).

The Agreement also contains the following provision regarding the solicitation of BDO employees:

> If Employee, without the specific written consent of the Chief Executive Officer, or his/her designee, solicits or otherwise causes another employee to leave [BDO] through unfair competition or business practices or in violation of Employee's fiduciary duty, including the unauthorized use of Confidential Information, or to perform engagements involving accounting, auditing, tax, investment advisory and/or consulting services for any firm, person or entity other than [BDO], then Employee will pay [BDO] an amount equal to the total of (i) twenty-five percent (25%) of the Annual Earnings of the departing employee, to cover the costs of replacing the departing employee; and (ii) an additional ten percent (10%) of the departing employee's Annual Earnings for each year of service of the departing employee, up to a maximum of fifty percent (50%) of the departing employee's Annual Earnings, to cover training costs.

(*Id.* at ¶ 7(b)).

Additionally, the Agreement provides that:

> The Parties hereby agree that the laws of the State of New York, excluding the conflicts of law provisions, shall apply to any action brought under this Agreement; agree that venue for any action or suit brought under this Agreement will be in any federal or state court of competent jurisdiction in New York County, New York; and Employee agrees to accept process in any such action.

(*Id.* at ¶ 17).

## II.    Rojas's Departure from BDO

Clients A, B, and C are all former BDO clients with whom Rojas worked with while he was employed at BDO. (*Id.* ¶¶60-63).

On November 3, 2023, Rojas transferred 14 .zip folders of Client B's own data from BDO's internal files to Client B. Although Rojas had provided tax services to Client B on behalf of BDO for multiple years, BDO claims that there is no legitimate reason why Rojas would have needed to

send Client B these files. (Compl., ¶¶47-54). Later that day, Rojas informed BDO that he was leaving BDO for Armanino's Denver office. (*Id.* ¶39). Armanino is a tax services company and one of BDO's competitors. (*Id.* ¶¶1, 10).

That same week, Caleb Crandell, BDO's Tax Practice Leader, and three BDO employees who had worked with Rojas and reported to Crandell — Timothy Vacchi, Kaylin Koopmans, and Tara Dunphy— also informed BDO they were leaving for Armanino. (*Id.* ¶¶40-42). Crandell and Vacchi have client and employee non-solicitation agreements with BDO. Koopmans and Dunphy do not have client and employee non-solicitation agreements but have non-disclosure agreements. (*Id.* ¶42). BDO alleges that Rojas solicited Vacchi, Koopmans, and Dunphy to come with him to Armanino. (*Id.* ¶43).

On November 9, 2023, BDO, concerned by these near-simultaneous departures for Armanino, sent Rojas and Crandell letters reminding them of their alleged post-employment obligations not to solicit BDO's clients or employees. (*Id.* ¶41). BDO also requested that Rojas sign an affirmation stating that he was in full compliance with the terms of his Agreement. (*Id.* ¶45). Rojas did not respond to BDO or sign the affirmation. (*Id.* ¶46).

## III.   Clients A, B, and C Follow Rojas to Armanino

On November 27, 2023, Client B sent an email to Rojas's Armanino email address and Crandell's former BDO email address asking for their advice on a tax matter. (*Id.* ¶57). Client B was still a BDO client at the time of this email. *Id.*

On December 6, 2023, Client C informed BDO that it had decided to move its tax work to Armanino. (*Id.* ¶59). Client C did not provide BDO with a reason for why it was leaving.

On December 12, 2023, Clients A and B separately informed BDO that they were also moving to Armanino. Client A said that it was moving to Armanino because of Rojas and Crandall.

Client B did not explicitly tell BDO that it was moving because of Rojas and Crandall but did say

that the two would be handling Client B's account upon the switch to Armanino. (*Id.* ¶¶48-50, 61-

62).

On December 14, 2023, BDO sent Rojas a letter demanding that he compensate BDO for

the lost clients —Clients A, B, and C—in accordance with the terms of his Agreement. BDO stated

that in the alternative, if Rojas claimed he had not breached his Agreement, he should sign and

return a declaration to that effect by December 21, 2023. (*Id.* ¶¶66-71). Rojas did not respond to

the letter. *Id.*

## IV.    Procedural History

On January 5, 2024, BDO brought suit in New York against Rojas for claims of breach of

contract, breach of the duty of loyalty, and as a faithless servant. (Compl.).[1] Rojas's contract claims

arise under his Agreement with BDO – which, as noted above, chose New York law as the law

governing all claims arising thereunder.

BDO alleges jurisdiction and venue in the Southern District of New York pursuant to the

Agreement's forum selection clause, which provides that: "The Parties hereby . . . agree that venue

for any action or suit brought under this Agreement will be in any federal or state court of

competent jurisdiction in New York County, New York; and Employee agrees to accept process

in any such action." (Compl., Ex. 1 at ¶ 17).

On February 21, 2024, Rojas moved for an order of this court dismissing the case in its

entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative,

transferring the action to the District of Colorado pursuant to 28 U.S.C. § 1404(a). (Dkt. No. 14).

---

[1] According to Plaintiff's counsel, BDO has also filed a related action against Crandell in the United
States District Court for the Eastern District of Virginia. While counsel cites to this complaint as though it
were an exhibit to his motion, no such exhibit appears in the record.

Rojas argues that BDO's claims are supported by allegations of a mere possibility of misconduct instead of actual misconduct, and that BDO has failed to allege sufficient facts to show that Rojas' Agreement is enforceable under Colorado's limited exceptions to non-compete agreements. In the alternative to dismissal, BDO asks that this action be transferred to the District of Colorado pursuant to 28 U.S.C. § 1404 because the public interest factors weigh strongly in favor of such a transfer.

BDO opposes Rojas's motion in its entirety. BDO argues that its complaint sufficiently alleges that the departures of BDO's clients and employees were actually part of Rojas's larger scheme to steal the same, in direct contravention of Rojas's Agreement and New York common law. BDO also argues that this court is the proper forum for BDO's action due to the Agreement's forum selection clause.

## DISCUSSION

The parties disagree about whether New York law or Colorado law applies to the instant dispute. Since the applicable law could impact analysis of the pending motions, I will first dispose of choice of law issues.

### I.    There Are Relevant, Substantive Differences Between New York Law and Colorado Law That Could Significantly Impact This Case

"A federal court sitting in diversity must apply the choice of law rules of the forum state." *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 641 (2d Cir. 2016) (*quoting Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989)). Under New York choice-of-law principles, "The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223, (1993). Under New York law, an actual conflict is present where there are "relevant substantive differences that could have a significant impact on

the outcome of the case*." Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005). If there are no differences between Colorado and New York law on the enforcement of covenants not to compete (the relevant legal principle in suit), then the court "will dispense with a choice of law analysis." *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

It turns out that there are significant differences between New York law and Colorado relating to the enforcement of non-compete clauses. The parties acknowledge as much by arguing their case under both New York and Colorado law. (*See* Dkt. Nos. 20, 23). Analysis of those differences indicates that the application of the law of one state or the other would significantly impact the result in this case.

### a.  Colorado Law Regarding Non-Solicitation Clauses

Colorado refuses to enforce restrictive covenants as a matter of public policy except in limited circumstances. *See, e.g., King v. PA Consulting Grp., Inc.*, 485 F.3d 577, 586 (10th Cir. 2007) ("Colorado . . . has a fundamental policy of voiding noncompete provisions that do not fall within one of [Colorado law's] statutory exceptions."); *DBA Enters. v. Findlay*, 923 P.2d 298, 302 (Colo.Ct.App.1996) ("Covenants not to compete, with some narrow exceptions, are contrary to the public policy of Colorado and are void."). The Colorado legislature has passed a law delineating in precisely what circumstances a covenant not to compete will be enforceable and limiting enforceability to those circumstances. The exceptions to the rule of unenforceability are found in C.R.S. § 8-2-113, and include restrictive covenants enforced: (1) against executive/management personnel, (2) for the protection of trade secrets, (3) against the purchase and sale of a business or the assets of a business, and (4) for the recovery of the expense of educating and training an employee who has served an employer for a period of less than two years.

Additionally, even a covenant that falls within one of these exceptions will not be enforced unless it is reasonable in subject matter, duration, and geographic scope, no broader than necessary to protect the employer's legitimate interests, and not impose a hardship on the employee. *Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006), *as mod. on denial of reh'g* (Feb. 15, 2007); *see also Findlay*, 923 P.2d at 302.

Colorado courts consider "an agreement not to solicit customers [a]s a form of an agreement not to compete" under C.R.S. § 8-2-113. *Phoenix Cap., Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007).

However, the requirements of C.R.S. § 8-2-113 do not extend to agreements not to solicit a former employer's ***employees***, and an agreement not to solicit fellow employees is enforceable in Colorado. *Id.*; *see also MGA Home Healthcare Colorado, LLC v. Thun*, No. 22-CV-02534-NYW-STV, 2023 WL 7003489, at *8 (D. Colo. Oct. 24, 2023).

### b. New York Law Regarding Non-Solicitation Clauses

By contrast, New York enforces restrictive covenants as a matter of course. Under New York law, "Courts analyze restrictive covenants in ordinary commercial contracts . . . 'under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract.'" *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001) (*quoting DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999)). A restrictive covenant is reasonable and will be enforced as long as it: "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999). Courts have confirmed that this test applies with equal force to provisions for non-solicitation of customers ***and*** employees. *See, e.g., Renaissance Nutrition, Inc. v. Jarrett*, 2012 WL 42171, at *2 (W.D.N.Y. 2012).

### c. Differences Between Colorado Law and New York Law

The difference between Colorado and New York law on this subject is stark. In Colorado, enforcement of a restrictive covenant (other than one that prevents the poaching of fellow employees) is the exception; in New York, if the *BDO Seidman* requirements are met, it is the rule.

Colorado has an exception to its public policy against non-competes for executive and management personnel. C.R.S. § 8-2-113(d) (2019). This exemption provided that noncompete agreements entered into by "[e]xecutive and management personnel" are enforceable against them. *Id.* The test for who qualifies focuses on job responsibilities, not titles. *DISH Network v. Altomari*, 224 P.3d 362, 367–68 (Colo. App. 2009). New York has no equivalent legal rule; we enforce covenants not to compete for all types of employees, executive or no.

Finally, Colorado has no bar whatsoever against the enforcement of an agreement not to solicit fellow employees, whereas New York applies the *BDO Seidman* requirements to such provisions.

At least two of these "substantive differences" in the law "could have a significant impact on the outcome of the case." *See Lehman Bros*, 414 F.3d at 332.

First, the parties disagree about whether Rojas qualified as "executive and management personnel" while employed at BDO. Under Colorado law, determination of this issue could be potentially dispositive. If, under Colorado law, Rojas is executive/management personnel, the non-compete he signed can be enforced against him; however, if Rojas is not executive/management personnel, then his agreement not to solicit BDO's customers – which is the basis for most of BDO's claims – is legally unenforceable. However, under New York law, a determination of this question is irrelevant, as New York does not limit the enforcement of restrictive covenants to executives and managers.

Second, "substantive differences" between these states' laws would have significant effect on BDO's claims about Rojas' alleged solicitation of the three former BDO employees (Vacchi, Koopmans, and Dunphy). Application of New York law would require the court to determine – under the *BDO Seidman* test – the Agreement's enforceability as to the non-solicitation of BDO employees. If the court were to determine that this particular non-solicitation provision was not enforceable under *BDO Seidman*, BDO's claims as to the alleged solicitation of the three former BDO employees would fail. But if Colorado law governs, Rojas' agreement not to poach his fellow employees is enforceable; there is no balancing test or other limitation on its enforceability.

Because there are meaningful substantive differences between the law of New York and Colorado on these points, it would seem that we must decide which state's law governs applying the conflicts of law principles of the forum state, which happens to be New York.

Not so, says BDO.

### d. *Ministers and Missionaries* Does Not Bar the Court from Engaging in a Conflicts Analysis

BDO argues that the court should not engage in *any* conflicts of law analysis since the parties' Agreement contains a choice of law provision – which the parties agree is valid – that dictates "the laws of the State of New York, excluding the conflicts of law provisions, shall apply to any action brought under this Agreement." (Compl., Ex. 1 at ¶ 17). In support of its position, BDO cites to the New York Court of Appeals' decision in *Ministers & Missionaries Ben. Bd. v. Snow*, 26 N.Y.3d 466 (2015), which held that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract." *Id.* at 474.

Rojas acknowledges the Court of Appeals' ruling in *Ministers*, but argues that it is inapplicable to the instant case, on the basis of the reasoning in *Medtronic, Inc. v. Walland*, No. 21 CIV. 2908 (ER), 2021 WL 4131657, (S.D.N.Y. Sept. 10, 2021).

I do not find this argument at all persuasive. The argument that Rojas *should have* made is that Second Circuit law – which binds this and every district court within the Circuit – requires me to conduct conflicts analysis even where, as here, the parties' contract contains a choice of law clause. As another of my colleagues, Judge Furman, explained in *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68 (S.D.N.Y. 2021), while some, "Lower federal and state courts have . . . observed that the language of *Ministers* is unequivocal and brooks no exceptions," this practice contradicts the Second Circuit's approach in *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020), which postdates *Ministers* by five years. *See Willis*, 550 F. Supp at 93-94.

In *Moseley*, the Second Circuit "described New York's general rule for assessing the effectiveness of contractual choice-of-law provisions as follows: 'New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative *so long as the State selected has sufficient contacts with the transaction.'" Id.* at 20 (emphasis added) (*quoting Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)). The Circuit continued: "As to contracts that violate public policy, the New York Court of Appeals has accordingly explained that, 'While parties are generally free to reach agreements on whatever terms they prefer, courts will not enforce [choice-of-law] agreements where the chosen law violates some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.'" *Id.* (*quoting Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 368 (2015)).

As other courts have noted, "*Moseley* is difficult to square with *Ministers & Missionaries* given the New York Court of Appeals's emphasis on 'the parties' intent' and its unequivocal directive that 'New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract.'" *Willis*, 550 F. Supp. at 94 (*quoting Ministers*,

11

26 N.Y.3d at 474-75); *accord Retina Assocs. of W. New York, P.C. v. McKesson Corp.*, No. 23-CV-6174-FPG, 2023 WL 7326050, at n.4 (W.D.N.Y. Nov. 7, 2023). "Nevertheless, [courts within this Circuit are] technically bound to follow the Second Circuit's interpretation of New York law unless and until it is overruled by the Second Circuit itself or it is undermined by 'a more recent decision regarding New York law from the New York Court of Appeals.'" *Willis*, 550 F. Supp. at 94 (*quoting Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 291 n.4 (S.D.N.Y. 2010)). To date, there has been no such overruling or clarification by either the Second Circuit or the New York Court of Appeals. Accordingly, in line with the universal approach taken by courts in this circuit post-*Moseley*, this court must proceed under the *Moseley* standard and undertake a conflicts of law analysis. *See Willis*, 550 F. Supp. at 94; *Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 418 (S.D.N.Y. 2023); *Retina* 2023 WL 7326050, at n.4; *LG Cap. Funding, LLC v. ExeLED Holdings Inc.*, No. 17-CV-4006 (LJL), 2024 WL 1116082, at *16 (S.D.N.Y. Mar. 13, 2024); *DF Ventures, LLC v. Aaron & Gianna, PLC*, No. 22-CV-9586 (LJL), 2024 WL 916343, at *10 (S.D.N.Y. Mar. 4, 2024); *DarkPulse, Inc. v. Crown Bridge Partners, LLC*, No. 22 CIV. 8163 (VM), 2023 WL 6386006, at *4 (S.D.N.Y. Sept. 29, 2023); *Busrel Inc. v. Dotton*, No. 1:20-CV-01767, 2022 WL 16559446, at *12 (W.D.N.Y. Nov. 1, 2022); *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120 (LJL), 2022 WL 1997207, at *15 (S.D.N.Y. June 6, 2022); *Medtronic*, 2021 WL 4131657, at *6.

One must never, however, lose sight of the governing standard set out in *Moseley:* absent fraud or a violation of public policy, the parties' contractual selection of governing law will be determinative as long as New York has sufficient contacts with the transaction. Moreover, because New York's law is the chosen governing law, the only public policy that is relevant when deciding this question is the public policy of the State of New York – not the public policy of any other

state. *Willis*, 550 F. Supp. at 95 (collecting cases). For our purposes, it is irrelevant whether application of New York law would violate some public policy of Colorado (*see* discussion *infra.* at Section II(a)). The parties chose New York to govern, and that is our default position. Moreover, the record contains no allegation of fraud or of any violation of New York's public policy. Therefore, New York law will govern unless New York does not have sufficient contacts with the transaction in suit.

The problem for BDO is that New York does not have any such contacts.

## II.     The Court Will Apply Colorado Law to the Case.

The parties' Agreement contains a choice-of-law clause that states: "The Parties hereby agree that the laws of the State of New York, excluding the conflicts of law provisions, shall apply to any action brought under this Agreement." (Compl., Ex. 1 at ¶ 17). BDO claims that New York law wins any choice of law analysis based on this provision. Rojas argues that this clause should not apply because: (1) application of New York law would violate Colorado's public policy against covenants not to compete (which, as we have already seen, is irrelevant, since the only public policy that matters here is New York's) ; and (2) New York does not have sufficient contacts with the transaction. It is the latter argument that dooms BDO's position.

### a.   It Is Immaterial Whether Application Of New York Law Would Violate Colorado's Public Policy Against Covenants Not to Compete

Rojas argues that application of New York law would violate Colorado's public policy against covenants not to compete. This argument misapprehends the scope of New York's "public policy" exception to choice-of-law clauses.

"Under *Moseley* and New York Court of Appeals decisions before *Ministers &* *Missionaries* . . . the only public policy relevant to the analysis is the public policy of this State — that is, *New York*." *Willis*, 550 F. Supp. at 95 (emphasis added). "And if that was likely the law

before the New York Court of Appeals's groundbreaking decision in *Ministers & Missionaries*, it is certainly the law now because . . . 'a requirement that New York courts consider the fundamental public policy of a foreign law would swallow whole the *Ministers* holding that courts need not engage in conflicts analysis.'" *Id.* (*quoting Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *22 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part on other grounds*, 796 F. App'x 55 (2d Cir. 2020) (summary order).

Accordingly, the court cannot and will not consider whether application of New York law would be violative of Colorado's public policy. The relevant public policy is that of New York, and Rojas offers no argument as to why application of New York law would violate New York public policy.

### b. New York Does Not Have a Reasonable Relationship with this Dispute

However, Rojas is correct when he argues that New York does not have any relationship, let alone a "reasonable relationship," with the instant dispute.

"In assessing whether there is a reasonable relationship, New York 'courts have looked to the location of the following factors: (1) the parties' negotiation of the agreement; (2) performance under the agreement, including where loan payments were received; (3) the parties' places of incorporation; (4) the parties' principal places of business; and (5) the property that is the subject of the transaction.'" *Cambridge Capital*, 675 F. Supp. 3d at 420 (*quoting Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 148 (S.D.N.Y. 2017)).

Here, the Agreement and transaction have no relationship whatever to New York. It is undisputed that: (1) the parties negotiated and entered the Agreement in Colorado and Massachusetts; (Dkt. No. 14-2 at ¶11) (2) Rojas lives in Colorado, performed his work for BDO almost exclusively in Colorado, and moved to Armanino's Denver, Colorado office (Compl., ¶¶ 19, 38-65); (3) the clients whom BDO claims Rojas solicited (Clients A, B, and C) are based in

14

Colorado (Compl., ¶38); (4) the employees (Vacchi, Koopmans, and Dunphy) whom BDO claims

Rojas solicited live and work in Colorado (*Id.*, ¶5; Dkt. No. 14-2 at ¶12) (5) BDO is incorporated

in Virginia with its principal place of business in Chicago, Illinois (Compl., ¶ 18); and (6) all

relevant events from the Complaint took place in Colorado. None of these facts is in any way

related to New York, and – with the exception of BDO's place of incorporation (Virginia) and the

location of part of the Agreement's negotiation (Massachusetts)– all relevant facts point to

Colorado as having the *only* relation to this dispute.

BDO attempts to establish a "reasonable relationship" to New York through two irrelevant

facts.

First, BDO points out that Rojas – while employed with BDO – once attended a training

event and investor relations meeting in New York for two days. (Dkt. No. 14-2 at ¶ 7). However,

BDO does not claim – nor can the court discern – that Rojas' attendance at this event gave rise to

or has any relation to the instant dispute. Accordingly, the court agrees with Rojas that this fact is

irrelevant to the court's choice of law analysis. Indeed, so insignificant is this fleeting and factually

irrelevant contact with New York that Rojas would not be subject to personal jurisdiction in New

York under our long arm statute had he not agreed to be sued here. *See, e.g., Presidential Realty*

*Corp. v. Michael Square W., Ltd.*, 44 N.Y.2d 672, 673 (1978) (a brief "physical presence alone

cannot talismanically transform any and all business dealings [into sufficient minimum contacts]

under CPLR 302.")

Second, BDO claims that Rojas "availed" himself of New York law because he sent

contracts to Clients A, B, and C, on behalf of BDO that contained New York choice of law

provisions. However, the test is not whether Rojas "availed" himself of New York law, but whether

New York has a "reasonable relationship" with the dispute. Evidence of a Colorado employee's

sending agreements to Colorado entities is not indicative of a "reasonable relationship" to New York, even if those agreements contained New York choice of law provisions. More importantly, these agreements were between BDO and its clients, not between BDO and Rojas, who merely sent the documents to the Clients on behalf of BDO and asked for their signatures. It is, therefore, BDO, not Rojas personally, who arguably "availed" itself of New York law.

BDO can point to not a single fact indicating that New York has any relationship with this dispute.[2] On the other hand, Colorado has an overwhelmingly strong relationship to the present matter. *See Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1104 (D. Colo. 2016). Whatever court decides this matter must apply Colorado law to the case.

That being so, the court that decides the case should not be this one.

### III.   Legal Standard for a Motion to Transfer

Under 28 U.S.C. § 1404(a), a district court may, "for the convenience of parties and witnesses, in the interest of justice . . . transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion . . . must evaluate both the convenience of the parties and various public-interest considerations." *Atlantic Marine Construction Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62 (2013). "The calculus changes, however, when the parties' contract contains a valid forum-selection clause." *Id.* at 63.

"The presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis . . . ." *Id.* at 63. "[A] court . . . should not consider arguments about the parties'

---

[2] BDO does not argue, and so the court will not consider, whether the fact that the company has offices in numerous states and an interest in having employment practices that conform across its many locations gives rise to any special interest in New York. I note, however, that BDO is neither incorporated in New York nor does it have its principal place of business here.

16

private interests . . . . A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* at 64. "As a consequence, a district court may consider arguments about public-interest factors only." *Id.* "Because those factors will rarely defeat a [valid forum-selection clause], the practical result is that forum-selection clauses should control except in unusual cases." *Id.*

However, "although a forum selection clause should be 'a significant factor' in the district court's decision on whether to transfer venue in a diversity action, it alone is not dispositive, and Section 1404(a) requires courts to take into account [the public interest] considerations." *Enjoy the City N., Inc. v. Stranger*, No. 3:08-CV-718, 2008 WL 4107195, at *4 (N.D.N.Y. Aug. 28, 2008) (*quoting Sherman Street Assocs. LLC v. JTH Tax, Inc.*, 2004 WL 2377227, at *2 (D.Conn. Sept.30, 2004)).

The scope of the court's analysis depends on whether the forum selection clause is "mandatory" (suit "shall" or "must" be brought in the chosen forum) or permissive (suit "may" be brought in the chosen forum). "If mandatory, the court analyzes the issue using the framework adopted by the Supreme Court in *Atlantic Marine*." *Encompass Aviation, LLC v. Surf Air Inc.*, No. 18 CIV. 5530 (CM), 2018 WL 6713138, at *5 (S.D.N.Y. Nov. 30, 2018).

Under *Atlantic Marine*, courts will ordinarily enforce a forum selection clause unless the party resisting enforcement demonstrates that "enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *See Miller-Rich v. Altum Pharms. Inc.*, No. 1:22-CV-03473 (JLR), 2023 WL 8187875, at *11 (S.D.N.Y. Nov. 27, 2023); *see also Atl. Marine*, 571 U.S. at 62-63. In deciding whether enforcement of a forum selection clause would be "unreasonable or unjust," courts consider "public interest factors," including: the "administrative difficulties flowing from court congestion; the local interest in having localized

controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 63 n. 6.

"As the party defying the forum-selection clause, the [movant] bears the burden of establishing that . . . the forum for which the parties bargained is unwarranted." *Id.* at 63. In order to reject a forum-selection clause, the Court must determine that the public interest factors "overwhelmingly disfavor" the clause's chosen forum. *Id.* at 67.

## IV.    Application of the *Atlantic Marine* Factors

The parties do not dispute that the Agreement's forum selection clause is valid, enforceable, and mandatory, or that the *Atlantic Marine* test applies to the instant dispute. Instead, the parties disagree about whether the *Atlantic Marine* factors favor transfer to the District of Colorado.

### a.    Factor 1: Administrative Difficulties Flowing from Court Congestion

Rojas argues that this first *Atlantic Marine* factor favors transfer for two reasons.

First, Rojas's argues that Colorado is the more convenient forum for its witnesses. However, convenience of the witnesses is a private interest and thus is "irrelevant to the Court's analysis given the presence of a valid and enforceable forum selection clause." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38, 51 (S.D.N.Y. 2020); *see also Signature Fin. LLC v. Neighbors Glob. Holdings*, LLC, 281 F. Supp. 3d 438, 453 (S.D.N.Y. 2017) (disregarding arguments as to location of critical witnesses as a private interest factor where the agreement at issue had a forum selection clause); *Lavazza Premium Coffees Corp. v. Prime Line Distributors Inc.*, 575 F. Supp. 3d 445, 466 (S.D.N.Y. 2021) ("Moreover, even accepting that litigating this case in New York will impose some burden on the parties and their witnesses, Defendant's argument is beside the point because the convenience of litigating in the forum is a

private, not public, interest."). "Since *Atlantic Marine*, the Second Circuit and courts within it have repeatedly dismissed challenges to a valid and enforceable forum selection clause based on the difficulty of procuring witnesses." *Avi & Co NY Corp v. ChannelAdvisor Corp.*, No. 22 CIV. 10599, 2023 WL 3293588, at *3 (S.D.N.Y. May 5, 2023). Notably, the only case Rojas cites in support of his argument, *Capitol Cabinet Corp. v. Interior Dynamics, Ltd.*, 541 F. Supp. 588, 590 (S.D.N.Y. 1982), did not include a forum selection clause or the application of the *Atlantic Marine* factors and thus is irrelevant to his argument.

Second, Rojas argues that transfer would serve the needs of judicial efficiency. According to Rojas, there is an outstanding motion to transfer to the District of Colorado in BDO's case against Crandall in the Eastern District of Virginia. Rojas hypothesizes that if both this court and the Virginia court granted transfer to the District of Colorado, Rojas could move to consolidate these two cases in the interests of fairness and judicial economy.

Rojas's argument is purely speculative and has nothing whatever to do with the "administrative difficulties flowing from court congestion." This court cannot know whether or not the Eastern District of Virginia will grant Crandall's motion to transfer. Additionally, even assuming the Eastern District of Virginia and this court both chose to grant transfer, this court cannot know whether the District of Colorado would grant a motion to consolidate. Moreover, this argument is more akin to considerations of the parties' convenience, which is a private interest factor. Notwithstanding these issues, courts have generally rejected this type of argument. *See, e.g., Tulepan v. Roberts*, No. 14 Civ. 8716 (KBF), 2014 WL 6808313 (S.D.N.Y. Dec. 3, 2014) (enforcing forum selection clause despite the fact that a "factually related" suit was pending in another district); *Allianz Global Corp. & Specialty v. Chiswick Bridge*, Nos. 13 Civ. 7559 (RA), 13 Civ. 7565 (RA), 2014 WL 6469027, at *3 (S.D.N.Y. Nov. 17, 2014) (enforcing forum selection

clause despite claims that litigating two "closely intertwined" matters in two fora would be "unduly costly and prejudicial").

In sum, this *Atlantic Marine* factor weighs neither for nor against transfer. This court is busy, but so are my colleagues in the District of Colorado. As other courts have pointed out, this factor is "never a factor to which great weight is assigned." *Residex Corp. v. Farrow*, 374 F. Supp. 715, 722 (E.D. Pa. 1974), *aff'd sub nom. Kornfeld v. Residex Corp.*, 556 F.2d 567 (3d Cir. 1977), and *aff'd*, 556 F.2d 568 (3d Cir. 1977) (*citing Peyser v. General Motors Corporation*, 158 F.Supp. 526 (S.D.N.Y.1958)).

### b. Factor 2: The Local Interest in Having Localized Controversies Decided at Home

#### i.    *This Is A Localized Controversy in Colorado*

"Courts have recognized that justice is promoted by having a localized controversy resolved in the region it impacts, and have consistently transferred cases when the challenged action predominately affects local interests." *Alabama v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 56, 67 (D.D.C. 2018) (internal citations and quotation marks omitted). Rojas argues that this is a "localized controversy" because it involves (1) a Colorado employee and citizen; (2) who worked in plaintiff's Denver, Colorado office; and (3) who has been sued for his alleged actions with respect to Colorado clients and employees. BDO does not dispute these facts, so the court agrees that this is a localized Colorado controversy.

#### ii.   *Colorado Has A Local Interest in Determining Whether Restrictive Covenants Should Be Enforced Against Its Citizens*

The parties disagree about whether Colorado has a local interest in having this controversy decided in Colorado. Rojas argues that Colorado has a strong public interest in determining whether restrictive covenants – such as those at issue in the Agreement – can be enforced against

a Colorado employee. BDO does not dispute that Colorado has such an interest, but instead argues that this argument is factually inapplicable to the instant dispute.

"Both state and federal courts have recognized Colorado's significant interest in limiting noncompete agreements." *King*, 485 F.3d at 586 (collecting cases). "Colorado . . . has a fundamental policy of voiding noncompete provisions that do not fall within one of [Colorado law's] statutory exceptions." *Id.*; *see also Findlay*, 923 P.2d at 302. This public interest is embodied in C.R.S. § 8-2-113, which invalidates all noncompete as applied against Colorado workers except in a few narrow exceptions.

BDO counters that the relevant authority speaks only to Colorado's interest as to the enforcement of ***non-compete clauses*** against Colorado employees. BDO reasons that the Complaint asserts claims based on allegations of Rojas's improper ***solicitation*** of clients and employees, and Rojas has not provided any support for the premise that Colorado has a special interest in deciding whether ***non-solicitation clauses*** can be enforced against a Colorado employee.

BDO is, however, incorrect. Colorado courts consider "an agreement not to solicit customers [a]s a form of an agreement not to compete." *Phoenix Cap.*, 176 P.3d at 844; *see also Great Am. Opportunities, Inc. v. Kent*, 352 F. Supp. 3d 1126, 1134 (D. Colo. 2018) (*citing Saturn Systems, Inc. v. Militare*, 252 P.3d 516 (Colo. App. 2011)). Agreements prohibiting employees from competing for existing customers are "precisely the type" of noncompetition agreements encompassed by C.R.S § 8–2–113. John R. Paddock, Jr., *Colorado Employment Law and Practice* § 5.30, at 249 (2d ed.2005)*; see also Management Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo.App.1988); (invalidating under § 8–2–113(2) a clause prohibiting the solicitation of customers because it "would have had the effect of restricting [the former employee] from

working for another employer in the recruitment business."). Accordingly, Rojas is correct that Colorado courts have a strong public policy towards determining whether restrictive covenants – such as those at issue in the Agreement – can be enforced against a Colorado employee. *See Nutting v. RAM Sw., Inc.,* 106 F.Supp.2d 1121, 1124 (D.Colo.2000) ("Colorado law embodies a strong public policy which disfavors covenants not to compete, protecting employees from non-competition clauses except in carefully defined circumstances."). These type of public policy preferences are strong indicators of a state's "local interest" in a dispute. *See Connex R.R. LLC v. AXA Corp. Sols. Assurance*, 209 F. Supp. 3d 1147, 1151 (C.D. Cal. 2016) (finding that "a district court located in California ha[d] a local interest in the action where the case implicate[d] causes of action or remedies that are important to California public policy."); *see also Wells Fargo*, 276 F. Supp. 3d at 1104.

Of course, Colorado's special public policy interest in this case extends only to BDO's claims regarding Rojas' alleged solicitation of Clients A, B, and C, and to any work Rojas performed at Armanino on those Clients' behalf. Colorado's interest does not extend to BDO's claims regarding Rojas's alleged solicitation of BDO *employees* because it does not offend Colorado's public policy to enforce such a restriction. *Phoenix Cap.*, 176 P.3d at 844. However, this distinction has only a slight impact on this court's *Atlantic Marine* analysis, as Rojas's alleged solicitation of BDO's *clients* underlies all three of his claims and forms the primary factual basis for his lawsuit.

Next, Rojas argues that Colorado's "local interest" in this type of case has only strengthened in recent years, pointing to the Colorado's legislature's revisions to C.R.S. § 8-2-113 in August 10, 2022. While the prior version of the statute – in effect on the date the Agreement was executed – governs the present dispute, *see Peterson v. Pickering*, No. 22-CV-0320, 2024 WL

729672, at *3 (D. Colo. Feb. 22, 2024), these most recent revisions, while not controlling as to the enforceability of the Agreement, could be instructive as to the current state of Colorado's attitude towards noncompete agreements. *See Davis v. Oasis Legal Fin. Operating Co., LLC*, 936 F.3d 1174, 1178 (11th Cir. 2019) ("Statutes, of course, are perhaps the clearest expressions of the public policy of [a state]."). Rojas points out two revisions in particular.

First, C.R.S. § 8-2-113 now provides that lawsuits over restrictive covenants like those provided for in the Agreement, ***cannot be litigated outside of Colorado***: "A covenant not to compete that applies to a worker who, at the time of termination of employment, primarily resided or worked in Colorado ***may not require the worker to adjudicate the enforceability of the covenant outside of Colorado*.*" Id.* at (6) (emphasis added).

If ever there was a clear indication of a state's "local interest in having [a] controvers[y] decided at home," this is it. *See Atl. Marine*, 571 U.S. at 63 n. 6. Colorado's legislature has explicitly barred the enforcement of forum selection clauses such as the one currently at issue in the Agreement. While this statutory revision does not render the Agreement's clause unenforceable – as the revisions are not retroactive – it does evince a clear preference by the state of Colorado to have the present dispute decided in Colorado, regardless of any contractual requirement to the contrary.

Second, Colorado's interest in keeping these sort of disputes "local", is made even more apparent by another addition to C.R.S. § 8-2-113: "***Notwithstanding any contractual provision to the contrary***, Colorado law governs the enforceability of a covenant not to compete for a worker who, at the time of termination of employment, primarily resided and worked in Colorado." *Id.*

BDO does not dispute the validity or effect of this revisions. Instead, BDO's only argument is that New York also has in interest in the present dispute because New York has an interest in

enforcing contracts governed by its law. As the court has decided that Colorado law applies to this Agreement, BDO's argument is of no moment.

In sum, Colorado has made clear – through C.R.S. § 8-2-113 – that it has a strong interest in adjudicating the enforceability of non-competes against Colorado workers in Colorado courts pursuant to Colorado law. Accordingly, this second *Atlantic Marine* factor weighs overwhelmingly in favor of transfer.

### iii.    Factor 3: The Interest in Having the Trial of a Diversity Case in a Forum That Is at Home with the Law

Finally, Rojas argues that the third factor weighs in his favor because the issues in this case center around Colorado law.

Rojas is correct that Colorado law applies to the instant dispute, and – at least at this stage – the issues in this case are centered around the enforceability of the Agreement's non-compete provisions under Colorado law, specifically C.R.S. § 8-2-113, a statute whose enforcement Colorado courts have acknowledged is particularly "complicated." *See, e.g., Peterson v. Pickering*, No. 22-CV-0320-WJM-KAS, 2024 WL 729672, at *3 (D. Colo. Feb. 22, 2024). And while "federal judges routinely apply the law of a State other than the State in which they sit," *Atlantic Marine*, 571 U.S. at 67, the fact that Colorado's law and its public policy are so different from New York's render this *Atlantic Marine* factor – which is normally entitled to little weight – of greater importance in the transfer analysis.

## V.    Rojas Has Established That the Public Interest Factors Overwhelmingly Disfavor the Clause's Chosen Forum of New York

This court finds that the present dispute is one of the "unusual cases" identified in *Atlantic Marine* as appropriate for transfer under 28 U.S.C. § 1404(a) notwithstanding a valid forum selection clause. This is a "rare" and "unusual" case where the transferee forum has explicitly declared a strong interest in adjudicating the matter at issue. Moreover, BDO has not identified a

single reason why New York would have ***any*** public interest in this case under the *Atlantic Marine* analysis.

In granting Rojas's motion to transfer, this court joins other courts that have refused to enforce forum selection clauses in the rare circumstance when their enforcement would jeopardize another forum's clearly enunciated public policy. *See, e.g., Davis v. Oasis Legal Fin. Operating Co., LLC*, 936 F.3d 1174, 1179 (11th Cir. 2019) (affirming the district court's refusal to enforce a forum selection clause since Georgia's legislature had announced a clear public policy against out-of-state lenders using forum selection clauses to avoid litigation in Georgia courts); *Connex R.R. LLC v. AXA Corporate Solutions Assur.*, 209 F. Supp. 3d 1147, 1151 (C.D. Cal. 2016) (declining to enforce a forum selection clause under the *Atlantic Marine* analysis since the "district court located in California ha[d] a local interest in the action where the case implicate[d] causes of action or remedies that are important to California public policy.").

**CONCLUSION**

For the reasons set forth above, Defendant's motion to transfer to the District of Colorado is GRANTED.

The Clerk of Court is respectfully directed to close the open motion at Dkt. No. 14 and transfer this action to the United States District Court for the District of Colorado.

Dated: June 27, 2024.

District Judge

BY ECF TO ALL COUNSEL